1           IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     OCALA DIVISION

3    UNITED STATES OF AMERICA,        Ocala, Florida

4           Plaintiff,                Case No. 5:16-cr-7-Oc-10PRL

5    -vs-                             Friday, April 8, 2016

6    JESSE ALAN TERRELL,              9:05 a.m.

7           Defendant.                Courtroom 3A

8    _____

9                     **EXCERPT OF JURY TRIAL**
                   **(TESTIMONY OF JAMES AMIDEI)**
10            BEFORE THE HONORABLE WM. TERRELL HODGES
                 UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21
     OFFICIAL COURT REPORTER:
22
            Shelli Kozachenko, RPR, CRR
23          221 N. Hogan Street, #185
            Jacksonville, FL  32202
24          Telephone:  (904) 301-6842

25                      (Proceedings reported by stenography;
                            transcript produced by computer.)

1                       A P P E A R A N C E S

2

3    GOVERNMENT COUNSEL:

4          **Lee Bentley, Esquire**
           U.S. Attorney's Office
           400 North Tampa Street, Suite 3200

5          Tampa, FL  33602

6          **Mark Blumberg, Esquire**
           U.S. Department of Justice - Civil Rights Division

7          950 Pennsylvania Avenue, NW
           Washington, DC  20530

8

9          **Maura White, Esquire**
           U.S. Department of Justice - Civil Rights Division
           601 D Street, NW, Suite 4908

10         Washington, DC  20579

11

12   DEFENSE COUNSEL:

13         **Charles Hollomon, Jr., Esquire**
           Charles R. Hollomon, PA

14         7 East Silver Springs Boulevard, Suite 200
           Ocala, FL  34470

15

16         **Beverly McCallum, Esquire**
           Beverly R. McCallum Law Firm, PLLC
           5411 S.W. 83rd Terrace

17         Gainesville, FL  32608

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

GOVERNMENT REBUTTAL WITNESS:                    Page No.

  JAMES AMIDEI

     DIRECT EXAMINATION BY MR. BLUMBERG........        4

     CROSS-EXAMINATION BY MS. McCALLUM.........       27

(NO EXHIBITS RECEIVED.)

1           P R O C E E D I N G S

2    Friday, April 8, 2016                          9:05 a.m.

3                      *   *   *   *   *

4        (In the presence of the jury:)

5            MR. BLUMBERG:  With the Court's permission, the

6    government would call Jim Amidei.

7            COURTROOM DEPUTY:  Please stay here and raise your

8    right hand.

9            Do you solemnly swear or affirm that the testimony

10   you're about to give before this Court will be the truth, the

11   whole truth, and nothing but the truth, so help you God?

12           THE WITNESS:  Yes, ma'am.

13           COURTROOM DEPUTY:  Please take a seat.

14           Go ahead and state your full name and then spell your

15   last name for the record, please.

16           THE WITNESS:  James Amidei.  Last name's A-m-i-d, as

17   in David, e-i.

18       JAMES AMIDEI, GOVERNMENT'S REBUTTAL WITNESS, SWORN

19                    DIRECT EXAMINATION

20   BY MR. BLUMBERG:

21   Q.   Good morning, sir.

22   A.   Good morning, sir.

23   Q.   At some point until recently you were a Marion County

24   Sheriff's Office deputy, correct?

25   A.   Yes, sir.

1   Q.   Are you anymore?

2   A.   No, sir.

3   Q.   Why not?

4   A.   I was terminated.

5   Q.   When did that happen?

6   A.   I think it was August 11th, 2014.

7   Q.   What are you doing now for work?

8   A.   I'm doing tile installation.

9   Q.   Would you tell the members of the jury a little about

10  yourself.

11          What kind of education do you have?

12  A.   I have some college.  I was in the Navy for five years,

13  started doing some college, and then I got hired at the

14  sheriff's office, and now I'm back in college now.

15  Q.   Prior to your termination at the MCSO, how long had you

16  been on the job?

17  A.   I was a full -- I was hired for three years.  Prior to

18  that I was in the Reserves for about eight months.

19  Q.   In August of 2014, what unit were you assigned to?

20  A.   I was in the fugitive apprehension unit.

21  Q.   What did they do?

22  A.   We were in charge of locating individuals in Marion County

23  that had active warrants for their arrest.

24  Q.   As part of the fugitive apprehension unit, were you

25  required, like other MCSO deputies, to undergo use-of-force

1  training?

2  A.    Yes, sir.

3  Q.    In August of 2014 are you comfortable that you understood

4  what FDLE and MCSO required of its deputies?

5  A.    Yes, sir.

6  Q.    Even in the process of apprehending fugitives?

7  A.    Yes, sir.

8  Q.    In summary and in general terms, what were you required to

9  do in terms of the amount of force you were permitted to use?

10  A.    We were allowed to use force as -- as needed.  Obviously

11  someone that's not compliant, you wouldn't use any force -- or

12  that is compliant, you wouldn't use any force, and then the

13  level goes up from there.

14  Q.    Did you follow your guidelines in August of 2014 as it

15  relates to the apprehension of Derrick Price?

16  A.    I did not.

17  Q.    Is that the reason why you are no longer an MCSO deputy?

18  A.    That is correct.

19  Q.    I want to talk to you about some of the time immediately

20  before the actual apprehension of Derrick Price, okay?

21  A.    Yes, sir.

22  Q.    To cut to part of it, you understood there was a large

23  operation with many houses that were the subject of several

24  search warrants, right?

25  A.    Correct.

1    Q.   At some point you learned information that Derrick Price,

2    or somebody that officers thought was Derrick Price, had fled

3    Derrick Price's home.  Is that fair?

4    A.   That's correct.

5    Q.   What did you do when you learned -- where were you when

6    you learned that information?

7    A.   I was in the front of the residence.

8    Q.   Whose residence?

9    A.   Derrick Price's residence.

10   Q.   Who were you with?

11   A.   I was by myself at that point.  The SWAT team had made

12   entry, and I was not on the SWAT team so I was -- I was back on

13   the road.

14   Q.   What did you do in response to hearing that information?

15   A.   I got in my vehicle and started to set a perimeter.

16   Q.   At some point you left that residence, right?

17   A.   Correct.

18   Q.   Who did you leave with?

19   A.   Well, like I said, I set a perimeter, did not locate

20   Derrick Price.  K-9 showed up to Derrick Price's house to start

21   a track.  I returned to the house and started to -- I left the

22   house with K-9.

23   Q.   Tyson Collins?

24   A.   Tyson Collins.

25   Q.   Who else did you leave the house with?

1   A.    Jesse Terrell and David Wolfe.

2   Q.    Did you, as a group, those three people, you and the two

3   others -- did you stay together or did you split up?

4   A.    We all stayed together.

5   Q.    Where did you go?

6   A.    We began a track through Marion Oaks of Derrick Price.   At

7   some point a little while later, we got word that he was at the

8   ABC child -- the --

9   Q.    The learning center, the day care?

10  A.    The learning center, the day care.

11        One of the patrol deputies gave us a ride to the ABC

12  center.

13  Q.    Did you get that information because of phone calls that

14  Mr. Price was having with various family members and

15  confidential informants?

16  A.    From what I understand, it was -- he was on the phone with

17  his mother.

18  Q.    Okay.  Did you get that information as a result of any

19  silent alarm or threat to the ABC learning center?

20  A.    I didn't hear of any alarm.

21  Q.    Would that have been important, if there had been some

22  kind of silent alarm or threat to the ABC learning center, to

23  you?

24  A.    Yes, sir.

25  Q.    Why would that have been important?

1  A.   Well, that's an indication that he might be inside of it.

2  I think we would have, you know, set up a perimeter or --

3  around the center.

4  Q.   If it had happened, would you have expected your

5  colleagues to let you know?

6  A.   Yes.

7  Q.   If it had happened and you were with Jesse Terrell, would

8  you have expected Jesse Terrell to let you know?

9  A.   Yes.

10  Q.   Was Jesse Terrell a SWAT member at the time that you were

11  tracking Derrick Price?

12  A.   Yes, he was.

13  Q.   Did he have more experience than you did?

14  A.   Yes, he did.

15  Q.   Would you have expected him to be able to keep you in the

16  loop of pertinent information regarding a fugitive hunt?

17  A.   Yes, sir.

18  Q.   He didn't tell you anything about a silent alarm, did he?

19  A.   I didn't hear anything about a silent alarm, no, sir.

20  Q.   All right.  Did you remain with Jesse Terrell and Tyson

21  Collins behind the ABC learning center?

22  A.   Yes.

23  Q.   At some point did the three of you split up?

24  A.   No, sir.

25  Q.   Okay.  What did you do after arriving --

1  A.   Well, I need to correct myself.  Tyson Collins at some

2  point picked up a scent and went into the woods, and I lost

3  sight of him when he went into the woods.

4  Q.   Technically the dog did.

5  A.   Well --

6  Q.   Picked up a scent.

7  A.   Oh, correct.  Yes, sir.

8  Q.   Okay.  He went in the woods.

9       Did you?

10  A.   No, sir.

11  Q.   Where did you go?

12  A.   I stayed on the outside of the woods.  There is an alley

13  between the wooded lot and the learning center, and that's

14  right where we stayed.

15  Q.   Where did Jesse Terrell go?

16  A.   He was in the same area I was.

17  Q.   Did he go in the woods?

18  A.   I did not see Jesse go into the woods.

19  Q.   Did he remain with you?

20  A.   Yes, sir.

21  Q.   Did he remain with you the entire time that you were there

22  up until the time that he jumped into a truck?

23  A.   Yes, sir.

24  Q.   Did you ever see him go into the woods?

25  A.   I did not see Jesse go into the woods.

1   Q.   Did you see him bump his head on branches?

2   A.   I didn't see him hit his head.

3   Q.   Did you see him crawl underneath limbs of trees?

4   A.   I didn't see him do that.

5   Q.   Did you see him go through some obstacle course of death

6   in the wooded area?

7   A.   No, sir.

8   Q.   Did he remain with you?

9   A.   Yes, sir.

10  Q.   Up until the time he jumped in a truck and went to the

11  Marion Oaks Optical Center?

12  A.   Yes, sir.

13  Q.   At some point you saw Derrick Price leave the woods and

14  head across Marion Oaks Boulevard?

15  A.   Yes, sir.  Shortly after the K-9 went into the woods.

16  Q.   Prior to that moment had you approached the ABC learning

17  center?

18  A.   We were -- when we got out of the vehicle, we were let out

19  right in front of the -- I guess the driveway of the learning

20  center.

21  Q.   Did you go to the building?

22  A.   We walked in between the learning center and -- there's

23  another building to the left there.

24  Q.   The pharmacy?

25  A.   Sure.  I'm not quite sure.

1   Q.    Did you go toward the building itself?

2   A.    I did not.

3   Q.    Did Jesse Terrell?

4   A.    It's possible.

5   Q.    Did you have any conversations with Jesse Terrell about

6   the ABC learning center?

7   A.    No, sir.

8   Q.    Did you have any conversations about human shields?

9   A.    No, sir.

10  Q.    Hostages?

11  A.    No, sir.

12  Q.    Children at risk?

13  A.    No, sir.

14  Q.    Did he ever tell you that you needed to be prepared to

15  take a head shot of Derrick Price?

16  A.    No, sir.

17  Q.    Did he ever need to calm you down to make sure that your

18  hands were steady in order to take a sniper shot of Derrick

19  Price?

20  A.    No, sir.

21  Q.    Was there any conversation of any kind about the

22  dangerousness of Derrick Price while you were out there

23  regarding the ABC learning center?

24  A.    Not while we were out there.  Just we had got word prior

25  to the -- prior to arriving at his house that he was armed and

1  dangerous.

2  Q.    The briefing.

3  A.    Correct.

4  Q.    Now, you're not a SWAT guy, are you?

5  A.    No, sir.

6  Q.    Is it your understanding that Jesse Terrell was on the

7  SWAT team at Derrick Price's house?

8  A.    Yes, sir.

9  Q.    About how much time were you and he walking back and forth

10 up along that road between the woods and ABC learning center?

11 A.    It wasn't very long.  Maybe five minutes.

12 Q.    At any point in time during that five minutes, not in the

13 woods --

14 A.    Yes, sir.

15 Q.    -- on the road, did he mention to you that he had seen

16 Derrick Price running out of the home?

17 A.    I don't -- no, sir.

18 Q.    At any point in time did he say that he had entered the

19 home and saw Derrick Price with a gun in his hand?

20 A.    No, sir.  He didn't tell me that.

21 Q.    Did he indicate that he saw anything in his hand that

22 would have been considered a weapon or dangerous?

23 A.    No, sir.

24 Q.    Would you have expected him to provide that information to

25 you if he had seen it?

1    A.   Yes, sir.

2    Q.   Why?

3    A.   That's pretty -- it's pretty pertinent information as far

4    as, you know, somebody that we're going after in a wooded area

5    that you can't see.   You would -- if we knew that he had a

6    definite, concrete answer that he had a firearm in his hand,

7    that would be pretty important.

8    Q.   As you were walking back and forth on that road next to

9    the woods, were you in -- were you in a vehicle?

10    A.   No, sir.

11    Q.   Did you have any cover of any kind?

12    A.   No, sir.

13    Q.   Would it have been even more important in that setting if

14    he knew that Derrick Price had a weapon when he fled his home?

15    A.   Yes, sir.

16    Q.   Did he ever tell you that?

17    A.   No, sir.

18    Q.   What happens when Derrick Price heads off across the

19    boulevard?

20    A.   About the time Derrick leaves the wooded area, I see a

21    pickup truck to my right or on the alleyway.   The pickup truck

22    accelerated towards us.   As it got closer, I seen that it was

23    Trevor Fitzgerald driving.

24          It slowed down once it got to us.   Jesse jumped in

25    the back of the truck.   I stayed on foot.   Derrick continued to

1  run across the street, and the truck accelerated after Derrick.

2  Q.   Did you run after the truck?

3  A.   I ran after the truck.

4  Q.   About how far behind the truck were you?

5  A.   No more than 50 to 100 yards.

6  Q.   Could you see the truck at all times?

7  A.   Yes.

8  Q.   Could you see the back of the truck at all times?

9  A.   Yes, sir.

10  Q.   Could you see Jesse Terrell in the back of the truck at

11  all times?

12  A.   Yes, sir.

13  Q.   Which way was Jesse Terrell facing?

14  A.   Towards -- towards Derrick Price, towards the front of the

15  vehicle.

16  Q.   Was he in a position to be able to watch Derrick Price?

17  A.   It appeared so.

18  Q.   Would that have been the obvious thing to do since they

19  were chasing Derrick Price?

20  A.   Correct.

21  Q.   Did you see him in distress in the back of that pickup

22  truck at all?

23  A.   Not particularly distressed, no.

24  Q.   Did you hear him yell anything from the back of that

25  pickup truck?

1   A.   No, sir.

2   Q.   Did you hear him yell, "Gun," or, "Object in his hand," or

3   anything like that?

4   A.   No, sir.

5   Q.   Were you close enough to be able to hear that if he was

6   yelling?

7   A.   Yes, sir.

8   Q.   Would you have expected to be able to hear that if he was

9   yelling, "Gun"?

10  A.   Yes, sir.

11  Q.   Would you have been paying attention to that?

12  A.   Yes, sir.

13  Q.   Why?

14  A.   Again, it's pretty important information.  I wasn't too

15  far behind the vehicle.  I could see Derrick and the vehicle

16  the whole time.

17  Q.   Approximately how many seconds behind the team were you

18  when you arrived at the area of Derrick Price on the ground?

19  A.   Somewhere probably 5 or 10 -- 5 to 10 seconds at the most.

20  Q.   Could you see the other officers get out of the truck?

21  A.   Yes, sir.

22  Q.   Did it appear that Jesse Terrell was impaired in any way?

23  A.   No, sir.

24  Q.   Did he have any trouble getting his bearings in any way?

25  A.   It didn't appear so.

1   Q.   Confused?

2   A.   No, sir.

3   Q.   Dazed?

4   A.   No, sir.

5   Q.   Instead, did he look purposeful?

6           MS. McCALLUM:  Objection.  Leading.

7           THE COURT:  Sustained.

8           Avoid leading, Mr. Blumberg.

9           MR. BLUMBERG:  Yes, sir.

10  BY MR. BLUMBERG:

11  Q.   Did you have any concerns about Jesse Terrell being able

12  to handle himself when he got out of the truck to approach

13  Derrick Price?

14  A.   No, sir.

15  Q.   All right.  Ultimately you got there, right?

16  A.   Yes, sir.

17  Q.   You made some bad decisions that day, didn't you?

18  A.   I did.

19  Q.   What bad decisions did you make?

20  A.   The first bad decision I made was I didn't prevent -- I

21  didn't prevent the beating.  I didn't stop any of my fellow

22  deputies from beating Derrick Price.

23  Q.   What was wrong with what was going on?

24  A.   Derrick Price had surrendered, was fully compliant.  There

25  was no need for any of it.

1   Q.    Is there any doubt about that?

2   A.    No, sir.

3   Q.    Now, you'd only been on the job for about three years or

4   so, right?

5   A.    Correct.

6   Q.    Did you have any concerns about whether Derrick Price was

7   trying to get up?

8   A.    No, sir.

9   Q.    Did you have any concerns about whether he was trying to

10  kick anybody?

11  A.    No, sir.

12  Q.    Was he trying to hit anybody?

13  A.    No, sir.

14  Q.    Was he screaming that he was going to kill somebody's

15  mother or anything like that?

16  A.    No, sir.

17  Q.    Was he saying anything other than, "I'm not moving"?

18  A.    No, sir.

19  Q.    What was your vantage point of the beating?

20  A.    When I first approached, I was -- I approached his left

21  side.  I was -- I came up in between -- I came up on Adam

22  Crawford's back, is where I came up on, and then I ended up

23  between Adam Crawford and Jesse Terrell.

24  Q.    Were you physically able to touch both of the two men?

25  A.    Yes.

```
1    Q.    And approximately how far were you from the body of
2    Derrick Price?
3    A.    Less than a foot, two foot, in that area.
4    Q.    Was your head hovering over both the two men and Derrick
5    Price simultaneously?
6    A.    Yes.
7    Q.    Were you in a position to be able to accurately see
8    everything that was going on?
9    A.    Yes.
10   Q.    Did you hear any of the officers say, "He's pulling away"?
11   A.    No, sir.
12   Q.    Did you hear any of the officers say, "He's trying to get
13   up"?
14   A.    No, sir.
15   Q.    Did you hear any of the officers saying, "He's pushing
16   off"?
17           MS. McCALLUM:  Your Honor, objection.  Counsel's
18   continuing to lead.
19           THE COURT:  Well, the last one, at least, I think is
20   in the nature of a developing question.  I'll overrule that
21   objection.
22           You may answer, Mr. Amidei.
23           THE WITNESS:  I didn't hear that, sir.
24   BY MR. BLUMBERG:
25   Q.    At some point everything stopped, right?
```

1    A.    Correct.

2    Q.    Did you have any interaction -- oh, before that, at some

3    point you turned and walked away, didn't you?

4    A.    I did.

5    Q.    Why'd you do that?

6    A.    No specific reason.  I -- I don't know.  I was kind of --

7    kind of taken aback from what I had seen.

8    Q.    Why?

9    A.    I was -- like I said, there was a beating happening right

10   in front of me.  Kind of a -- kind of a situation that --

11   it's -- I didn't know what to do.  I kind of walked away for a

12   minute, came back, and, again, did nothing.

13   Q.    Was it a moment in which you thought you might have to

14   make some decisions?

15   A.    Yes, sir.

16   Q.    How do you feel about those decisions today?

17   A.    They don't set well with me.

18   Q.    Would you have turned your back on your fellow officers if

19   you thought there was a risk to them?

20   A.    No, sir.

21   Q.    Would you have turned your back on your fellow officers if

22   you thought there was a threat?

23   A.    No, sir.

24   Q.    Would you have turned your back if you thought that

25   Derrick Price had a weapon for one moment?

1  A.   No, sir.

2  Q.   Or if any of those officers suggested he was trying to get

3  away?

4  A.   No, sir.

5  Q.   Why?

6  A.   If there's a threat or I deemed him dangerous, the last

7  thing I would do is turn my back on it.

8  Q.   After it's all over, did you have any interaction with

9  Jesse Terrell?

10  A.   Immediately after it was all done, he got handcuffed, and

11  Jesse stood up and approached me.  At that point he -- he told

12  me verbatim, "Turn your damn camera off," and he reached over

13  and turned my camera off.

14  Q.   What was your reaction to that?

15  A.   I didn't -- kind of -- again, I was shocked by what just

16  happened.  I kind of, again, didn't know what to do.

17  Q.   Did you think he was trying to save the camera's battery?

18  A.   No, sir.

19  Q.   Did you think he was trying to make sure you didn't take a

20  non-Mirandized statement of Derrick Price?

21  A.   No, sir.

22  Q.   What did you think he was doing?

23  A.   Trying to -- I mean, we were in a situation that wasn't --

24  wasn't legal, wasn't justified, so probably to prevent any

25  further evidence from being captured or something along those

1  lines, I would imagine.

2  Q.   Did you have any conversations with him afterwards in

3  which he expressed concern or puzzlement over what had just

4  happened?

5  A.   No, sir.

6  Q.   Did he ever say to you, "Hey, how did that go from zero to

7  90 in nothing flat"?

8  A.   No, sir.

9  Q.   Did it appear that he had the exact same understanding

10 that you had about what had happened?

11           MS. McCALLUM:   Objection.  Calls for speculation.

12           MR. BLUMBERG:   That question was specifically asked

13 of the defendant about his conversations with Jim Amidei.

14           THE COURT:   I'll overrule the objection.  You may

15 answer.

16           MR. BLUMBERG:   Thank you, sir.

17           THE WITNESS:  No, sir.

18 BY MR. BLUMBERG:

19 Q.   Okay.  You say you were troubled by what happened even on

20 the scene, right?

21 A.   Correct.

22 Q.   Did you express that to anybody at the time?

23 A.   I spoke with Tyson when he first got there.

24 Q.   What's Tyson's last time?

25 A.   Collins.

1    Q.    The dog handler.

2    A.    Correct.

3    Q.    The same guy who was in the woods before.

4    A.    Correct.

5    Q.    And what did you say to him?

6    A.    I said something along the lines that, "Your boy Jesse

7    messed up, went too far," something like that.

8    Q.    How much time had passed between the end of beating

9    Derrick Price and when you said that?

10   A.    Less than a minute.  A minute, two minutes.

11   Q.    Did you make reference to Hoppel?

12   A.    No.

13   Q.    Did you make reference to Crawford?

14   A.    No.

15   Q.    Did you make reference to Fitzgerald?

16   A.    No, sir.

17   Q.    Why did you single out Jesse Terrell?

18   A.    During the -- during the incident he was -- you know, he

19   was on the defendant's face, punching the defendant in the

20   face.  That kind of, at the time, stood out the most to me.

21   You know, what we all did was incorrect, but that was -- kind

22   of stood out the most.

23   Q.    Afterwards was the arrest yours to document and to manage?

24   A.    Yes, sir.

25   Q.    Does that mean you were responsible for the property of

1  the suspect?

2  A.    Usually it is.

3  Q.    In this case was it?

4  A.    That day it was.

5  Q.    All right.  Were you in charge of gathering up Derrick

6  Price's belongings?

7  A.    That day I don't 100 percent remember who -- who all

8  gathered his belongings.  I did take possession of it at one

9  point.

10  Q.    Okay.  And then were required to provide that to the

11  people writing reports, right?

12  A.    Correct.

13  Q.    Did you take everything that you had been given?

14  A.    Yes.

15  Q.    Did you conduct a search of Derrick Price yourself?

16  A.    I did a patdown of him, yes, sir.

17  Q.    Okay.  Did you retrieve things from him?

18  A.    From him, no.

19  Q.    Did you retrieve things that had been retrieved from other

20  officers?

21  A.    I -- yes.

22  Q.    At any point in time did you take a knife off of Derrick

23  Price?

24  A.    I did not, no, sir.

25  Q.    Did anybody give you a knife that had been taken off of

1   Derrick Price?

2   A.   No, sir.

3   Q.   Did anybody have any conversation about finding a knife on

4   Derrick Price?

5   A.   I didn't have any conversation of a knife.

6   Q.   If you were responsible for gathering the evidence, would

7   you have expected somebody to tell you that?

8   A.   Yes, sir.

9   Q.   Did you steal Derrick Price's knife?

10   A.   No, sir.

11   Q.   Did you hide it in some fashion?

12   A.   No, sir.

13   Q.   Did you lose it and not want to tell us about it?

14   A.   No, sir.

15   Q.   If the knife was open in the pocket of Derrick Price,

16   would that have been important information for you, with

17   responsibility for documenting the arrest?

18   A.   Yes, sir.

19   Q.   Why?

20   A.   An open knife versus a folded knife, I think if you have

21   an open knife, it kind of might be able to justify the beating

22   a little better, might be able to justify -- a dangerous

23   weapon, you know, something along those lines.

24   Q.   And to be fair, you did try and falsely justify the

25   beating of Derrick Price, didn't you?

1  A.    I did.

2  Q.    Is it true that you falsified documents?

3  A.    I did.

4  Q.    Is it true, to your knowledge, that your colleagues

5  falsified documents?

6  A.    I didn't read them, but to my knowledge, yes, sir.

7  Q.    Okay.  At any point in time do any of those documents

8  reflect an open knife?

9  A.    No, sir.

10  Q.    So you were willing to make up stuff to show

11  dangerousness, weren't you?

12  A.    Yes, sir.

13  Q.    If there was an open knife in the man's pocket, would you

14  have put it in the report to help justify the beating?

15  A.    Yes, sir.

16  Q.    Did you?

17  A.    No, sir.

18  Q.    Was that because there was no knife?

19  A.    There was no knife.

20        MR. BLUMBERG:  With your permission, Your Honor, I

21  just want to talk to my colleagues for a moment.

22        THE COURT:  Surely.

23        MR. BLUMBERG:  That's all the questions I have for

24  Mr. Amidei, sir.

25        THE COURT:  Ms. McCallum.

1          MS. McCALLUM:  Yes, Your Honor.

2          May it please the Court, ladies and gentlemen of the

3     jury.

4                         CROSS-EXAMINATION

5     BY MS. McCALLUM:

6     Q.   Mr. Amidei, you didn't testify in the first days of this

7     trial, did you?

8     A.   No.

9     Q.   In the days leading up to this trial, you met with

10    officials at the Department of Justice, didn't you?

11    A.   I did.

12    Q.   And that included officials such as those from the U.S.

13    Attorney's Office?

14    A.   Yes, ma'am.

15    Q.   And also the Federal Bureau of Investigation, or FBI?

16    A.   Yes, ma'am.

17    Q.   Also representatives from what I'll call main justice,

18    that is, the Department of Justice DC location.  Is that

19    correct?

20    A.   Correct.

21    Q.   How many times did you meet with DOJ officials before

22    today's testimony?

23    A.   Three or four, possibly.

24    Q.   Where did you have those meetings?

25    A.   We had meetings -- their building here in Ocala and -- and

1  that was it.  We had pled guilty here in Ocala.

2  Q.    And since the trial has been ongoing, how many times, if

3  at all, have you met with Department of Justice officials?

4  A.    Somewhere between three to five probably.

5  Q.    And about how long do you think you met with them during

6  the course of this trial to discuss the trial, if you did?

7  A.    A couple hours.

8  Q.    You said you pleaded guilty in connection with the beating

9  of Mr. Price on August 7th of 2014, correct?

10  A.    Yes, ma'am.

11  Q.    And as part of that plea agreement, you explained to the

12  Court those things that you had done or not done, as the case

13  was, to deprive Derrick Price of his civil rights under color

14  of law.  Is that right?

15  A.    That's correct.

16  Q.    When you did that the responsibility was for you alone --

17  is that correct? --

18  A.    Correct.

19  Q.    -- the legal responsibility?

20        But you testified earlier on direct examination that

21  you had falsified information in the supplemental report that

22  you wrote in this case, correct?

23  A.    Correct.

24  Q.    And in part you did that by minimizing your own

25  responsibility?

1   A.   Yes, ma'am.

2   Q.   In this trial it has been discussed that you made an

3   inventory of Mr. Price's personal belongings and included that

4   in your reporting.

5        Did you?

6   A.   I did not.

7   Q.   In your narrative -- in the narrative produced, I should

8   say, in this case was there a portion that was devoted to what

9   you found when you patted down Mr. Price?

10  A.   No.

11  Q.   Did you tell any other officer what you found, if

12  anything, when you patted down Mr. Price?

13  A.   No, ma'am.

14  Q.   So if another officer at MCSO wrote a report making it

15  appear that they had gotten information like that from you,

16  that would be false?

17  A.   I'm sorry?

18  Q.   If any officer besides yourself wrote a narrative that

19  included information from you, or attributed to you, about what

20  you took from Mr. Price, would that be false?

21  A.   I guess I'm understanding correctly.  You're saying if

22  another deputy wrote their report --

23  Q.   And claimed --

24  A.   -- and claimed --

25  Q.   -- that you gave them information --

1  A.   -- that I had collected something?

2       I didn't collect anything from Derrick Price

3  directly.

4  Q.   Let me turn your attention for just a moment to the events

5  of August 7th, 2014.

6       If I understood your testimony, you indicated that

7  you were running across Marion Oaks Boulevard at one point.  Is

8  that correct?

9  A.   Correct.

10 Q.   And were you catching up with the truck at that point?

11 A.   The truck was faster than I was.  I wasn't catching up

12 with it, no.

13 Q.   Understood, since it was a truck and you were a human.

14      As you ran across Marion Oaks Boulevard, what were

15 you looking at, precisely?

16 A.   I was looking at Derrick Price and the vehicle.

17 Q.   You were looking at Derrick Price and the vehicle

18 simultaneously?

19 A.   I was back and forth.  That's what I was looking at.

20 Q.   So if you were looking back and forth between Mr. Price

21 and the vehicle, then it's fair to say that you couldn't see

22 what was going on exactly in the other location, that is,

23 Mr. Price versus the vehicle, at any given moment, correct?

24 A.   That's fair.

25 Q.   And you attested on direct examination that you knew where

1    Mr. Terrell was positioned in the back of the truck at any

2    given moment, correct?

3    A.    I know where he was.

4    Q.    But you were not looking at him at every moment as you

5    were crossing the road and approaching Mr. Price.  Is that fair

6    to say?

7    A.    At every moment, no, ma'am.

8    Q.    Before you accepted responsibility in this beating of

9    Mr. Price, you tried to blame others.

10          You were continuing to do that as you spoke with FBI

11   initially, correct?

12   A.    I did.

13   Q.    And how did you indicate that others were responsible?

14   A.    Sorry.  Ma'am?

15   Q.    What did you tell FBI about why you weren't responsible?

16   A.    Well, initially I definitely played the victim card.  I

17   played I ran up on the scene, and I felt that I wasn't as

18   guilty as other -- the other deputies that were actually doing

19   the beating.

20          I lied to FDLE about seeing Derrick Price put his

21   hands in the air.  I definitely did that.  The reason I did

22   that is, like you said, to separate myself from everybody else

23   and to -- and to take -- hopefully take some responsibility

24   away from me and take the -- you know, any -- any of the

25   actions away from me, that's for sure.

1  Q.   And you testified in the grand jury in connection with the

2  case about Mr. Price, correct?

3  A.   Correct.

4  Q.   And you did that last year?  Is that right?

5  A.   I don't remember the exact date.

6  Q.   Where did you appear in grand jury?

7  A.   Grand jury was in Tampa, Florida.

8  Q.   And do you remember that day?

9  A.   I do.

10 Q.   Do you remember in grand jury indicating that it can be a

11 concern if a suspect is prone and could possibly have a firearm

12 in his or her waistband?

13 A.   Correct.

14 Q.   And do you remember indicating in grand jury that you had

15 no independent recollection as to Mr. Terrell kicking

16 Mr. Price?

17 A.   That's correct.

18 Q.   Yet it's your testimony today that you have what could be

19 called good recall as to any hits that he gave to Mr. Price.

20 Is that right?

21 A.   That's correct.

22 Q.   In your plea agreement you've agreed to attempt to give

23 substantial assistance.  Is that right?

24 A.   Yes, ma'am.

25 Q.   What is substantial assistance, as you understand it?

1  A.    Substantial -- it's a -- basically to cooperate with the

2  remainder of this case and my case and to be honest with the

3  remainder of the case.

4  Q.    What's your understanding, if you provide substantial

5  assistance, in the government's opinion, as to what it will

6  mean for you?

7  A.    It's a possibility I would receive a recommendation to the

8  judge that basically said that I assisted.

9  Q.    Is it true that in grand jury you indicated that you

10 believed substantial assistance was testimony that will lead to

11 the -- you know, provide more evidence toward another

12 defendant?

13 A.    I don't remember exactly what I said, but that's -- if

14 that's what I said.

15 Q.    Could that have been your understanding at the time of

16 grand jury?

17 A.    It's -- it's my understanding right now as well.

18 Q.    So by coming in now, not in the government's case in chief

19 but in rebuttal, after both sides have rested, you're

20 effectively giving more evidence against a particular

21 defendant.  Is that right?

22         MR. BLUMBERG:  Objection, Your Honor, as it relates

23 to what the government's order of proof was and why Mr. Amidei

24 was called now versus in the case in chief.

25         THE COURT:  Yeah.  I'm inclined to sustain that

1  objection.

2  BY MS. McCALLUM:

3  Q.   Mr. Amidei, today is it your understanding that part of

4  what you're doing besides telling the truth is giving evidence

5  against a different defendant?

6  A.   My understanding today is I'm here just to tell the truth.

7  Q.   And that's -- you discussed telling the truth with the

8  government.  Is that correct?

9  A.   Correct.

10  Q.   And did you discuss telling the truth very recently with

11  the government?

12  A.   I did.

13  Q.   Did you discuss with the government the fact that you

14  might be asked by the defense whether you were telling the

15  truth?

16  A.   I did.  I -- you know, I lied at the beginning of this

17  case and, you know, that's -- it takes away from my character,

18  for sure.

19  Q.   Is it your understanding that you could have been charged

20  under Title 18, United States Code, 1001 for making false

21  statements in connection with this case?

22  A.   Yes, ma'am.

23  Q.   And when I say this case, I mean the broader case against

24  all of the individuals involved, including you.

25  A.   Yes, ma'am.

1  Q.    And is it your further understanding that you could have

2  been charged with a violation of Title 18, United States Code,

3  Section 1512, for obstruction?

4  A.    Yes, ma'am.

5  Q.    Is it your understanding that you're not being charged

6  with those things because you have agreed to plead guilty and

7  provide substantial assistance?

8  A.    Yes, ma'am.

9  Q.    Is it your understanding that if you violate that plea

10  agreement that you could still be charged with those two

11  crimes?

12  A.    Yes, ma'am.

13  Q.    Is it your understanding that those are serious crimes?

14  A.    Absolutely.

15  Q.    Have you reviewed the audio from your body camera?

16  A.    I have.

17  Q.    And did you do that close to the time of the events

18  involving Mr. Price or more recently?

19  A.    Both.

20  Q.    In your reviews of that audio, did you note the audio and

21  the video -- or, I should say, the audio portion of the video

22  picking up Jesse Terrell telling you to turn off your body

23  camera?

24  A.    No.

25  Q.    And why is that not caught on the audio, if you know?

1    A.    Because he turned the camera off prior to making that

2    statement.

3    Q.    At some point in the events that you described of August

4    7th, 2014, you talked about where you were positioned in

5    reference to other officers.

6          I'm going to turn your attention to your proximity or

7    your closeness to the K-9 officer and to Officer Terrell prior

8    to Mr. Price being subdued.

9          Do you remember that?

10   A.    Yes, ma'am.

11   Q.    Isn't it true that you fell behind the K-9 and Mr. Terrell

12   because of your physical conditioning?

13   A.    I wouldn't say that's accurate.

14   Q.    You've reviewed the video of the beating of Mr. Price,

15   correct?

16   A.    Correct.

17   Q.    Were you able to see anything that could have been a knife

18   exposed in Mr. Price's pocket after he was lifted up off the

19   ground?

20   A.    I didn't.

21   Q.    How many times would you estimate that you've lied during

22   the course of the events leading up to today?

23   A.    I lied in my FDLE interview, and I also began to lie to --

24   during my FBI interview.

25   Q.    Yet here today you expect for this jury to believe the

1   words coming out of your mouth.

2   A.  It's very understandable, and I understand your concern.

3   The difference is back then I was lying not to protect them but

4   to protect me.  What I lied about was mainly seeing Derrick

5   Price surrender, which doesn't relate to anybody else.  So --

6   Q.  But you sit before the jury today a police officer who

7   violated the Constitution in connection with the beating of a

8   defendant, correct?

9   A.  That's correct.

10   Q.  And today you sit before this jury and also before the

11   judge who will sentence you in this case.  Is that correct?

12   A.  That's correct.

13   Q.  When, if you will, will you have a better opportunity to

14   render substantial assistance under your plea agreement between

15   now and sentencing?

16         MR. BLUMBERG:  Objection.  That's not for the witness

17   to be able to answer, Your Honor.

18         THE COURT:  I'll sustain that objection.

19         MS. McCALLUM:  No further questions, Your Honor.

20         THE COURT:  Any redirect, Mr. Blumberg?

21         MR. BLUMBERG:  No, sir.  Thank you.

22         THE COURT:  All right.  Thank you, Mr. Amidei.  You

23   may step down.

24                *  *  *  *  *

25

1  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4  UNITED STATES DISTRICT COURT )

5  MIDDLE DISTRICT OF FLORIDA    )

6

7      I hereby certify that the foregoing transcript is a

8  true and correct computer-aided transcription of my stenotype

9  notes taken at the time and place indicated therein.

10

11      DATED this 9th day of May, 2016.

12

13                          s/Shelli Kozachenko_____
                            Shelli Kozachenko, RPR, CRR
14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25